2026 IL App (1st) 242037-U
Order filed: July 15, 2026

FIRST DISTRICT
THIRD DIVISION

No. 1-24-2037

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 08 CR 18525 |
| | ) | |
| TIMOTHY EASLEY, | ) | Honorable |
| | ) | Geraldine D'Souza, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE ROCHFORD delivered the judgment of the court.
Presiding Justice Martin and Justice Lampkin concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm the second-stage dismissal of defendant's initial and supplemental postconviction petitions.

¶ 2    Defendant, Timothy Easley, appeals the second-stage dismissal of his initial and supplemental postconviction petitions. We affirm.

¶ 3    The State charged defendant with the aggravated criminal sexual assault and first-degree murder of the 15-year-old victim, B.G. At trial, B.G.'s mother, Patricia G., testified that she lived with her daughter in Sauk Village in 2008. On April 2, 2008, Patricia arrived home from work between 10:30 p.m. and 11 p.m. and discovered that B.G. was not there. Patricia contacted police.

¶ 4    Nalicia Livingston testified she was best friends with B.G. and that they were sophomores in high school. Defendant was a 17-year-old junior who attended the same school. In late 2007, B.G. and defendant dated for two or three months until they broke up because B.G. refused to have sex with defendant.

¶ 5    On April 2, 2008, B.G. told Livingston that she planned to have sex with defendant later that night at his house. The next morning, on April 3, 2008, Livingston went to school and learned that B.G. was missing. Livingston spoke with defendant later that day about B.G.'s disappearance and asked him if he had seen her the night before. Defendant told her that he and B.G. had walked around Sauk Village on April 2, after which he walked her back home. Livingston asked defendant whether he and B.G. engaged in sex on April 2. Defendant said no. Livingston had another conversation with defendant the next day, on April 4, and she again asked him about his interaction with B.G. on April 2. Defendant told her he had taken B.G. to Rickover Junior High School (Rickover) on April 2 and left her there.

¶ 6    Detective Michael Davitt testified he investigated B.G.'s disappearance and on April 4, 2008, he conducted a grid search of a marsh field and creek near Rickover. B.G.'s body was found in the creek by Ricardo Johnson, a Sauk Village fire officer. She was wearing only a jacket and two shirts, but not pants. A white sock was recovered 100 feet north of the body, along with a pair of gym shoes and a pair of blue jeans with underwear sticking out of the right front pants pocket. Another sock was wrapped up inside the jeans.

¶ 7    Dr. Kendall Crowns performed the postmortem examination of B.G. and found abrasions on her forehead, chin, neck, and vaginal canal. She also had two lacerations on her right cheek. Dr. Crown found hemorrhages on B.G.'s right thyrohyoid and mylohyoid muscles and on her

posterior cricoarytenoid muscle and her scalp. Dr. Crowns concluded that B.G. died of manual strangulation and that the manner of death was a homicide.

¶ 8      David Turngren, a forensic scientist with the Illinois State Police and an expert in the field of DNA comparison and identification, developed a DNA profile from a vaginal swab of B.G., and another DNA profile from a buccal standard from defendant. He found that the single-source human male DNA profile identified in B.G.'s vaginal swab matched the DNA profile of defendant at all 14 comparison locations.

¶ 9      Catherine Kulakowski testified about two instances occurring six weeks prior to B.G.'s murder in which defendant reacted violently when Kulakowski rejected his sexual overtures. The evidence was admitted to show defendant's intent and lack of an innocent frame of mind at the time of B.G.'s sexual assault.

¶ 10      First, Kulakowski testified that in February 2008, when she was a junior in high school, defendant approached her during their physical education class and told her he wanted more than just friendship with her, "hinting more towards sex." Kulakowski said no. Defendant then violently grabbed both of her arms, bruising them.

¶ 11      Second, Kulakowski testified that on another occasion in February 2008, defendant approached her during their science class and told her that she was going to have sex with him. Kulakowski again told him no. Defendant then angrily slammed his chair down and swiped all the books off the desk.

¶ 12      During closing arguments, the State argued its theory that on April 2, 2008, B.G. met with defendant to have sex with him but changed her mind. Defendant became angry and sexually assaulted her in the marsh field. B.G. tried to run away and defendant killed her. During defense closing arguments, defendant argued that he and B.G. had consensual sex at his house on April 2,

2008, after which he dropped her off near Rickover. As B.G. was walking home, an unknown assailant or assailants sexually assaulted and murdered her.

¶ 13　The jury convicted defendant of aggravated criminal sexual assault and first-degree murder and the court sentenced him to 75 years' imprisonment. Defendant filed a direct appeal (*People v. Easley*, 2015 IL App (1st) 130704-U), which we will now discuss in some detail as one of the issues raised there is pertinent to the postconviction claim currently on appeal.

¶ 14　On direct appeal, defendant argued that the trial court erred by denying his pretrial motion to admit evidence that a third person, Najee James, confessed to B.G.'s murder. *Id.* ¶ 31. In the motion, defendant alleged that on April 4, 2008, Phillip Lopez arrived at a friend's house party at or around 223rd Street and Torrence Avenue. James was also at the party. Lopez and James knew each other and had occasionally talked. James told Lopez and others at the party that he had murdered a girl at a nearby creek. James said that he had tried to take money from the girl's purse, and when she resisted, he choked her with a belt and accidentally killed her. He and a friend then threw the body into the creek. Lopez saw James again on April 5, 2008, and James nervously asked him questions regarding the methods police officers use to catch murderers. After talking with James on April 5, Lopez subsequently went to the police and informed them of James's confession. James was interrogated by police on June 9, 2008, denied making the confession, and was released.

¶ 15　Defendant argued in his motion that James's confession to Lopez was sufficiently trustworthy that it should be admitted under *Chambers v. Mississippi*, 410 U.S. 284 (1973) as an exception to the hearsay rule for a statement made against penal interest. *Chambers* identified four factors to help determine the trustworthiness of a hearsay statement: (1) whether the statement was spontaneously made to a close acquaintance shortly after the crime occurred; (2) whether the statement is corroborated by other evidence; (3) whether the statement is self-incriminating and

against the declarant's interests; and (4) whether there was adequate opportunity for cross-examination of the declarant. *Id.* at 300-01. Defendant argued that James's statement met all four factors.

¶ 16   The State filed a response, arguing that there is no objective indicia that the statement was ever made because James denied making the statement and Lopez did not go to the police "until nearly two months after the alleged statement" and after the news media had reported the killing. The State noted that Lopez's account of James's confession to strangling B.G. was similar to news coverage from as early as April 8 which reported that B.G.'s dead body had been found strangled in a creek near 223rd Street and Torrence Avenue. The State further noted that details withheld from the press, such as that B.G.'s body was naked from the waist down, and that she had been sexually assaulted, were not contained in James's statement as reported by Lopez. Also, whereas Dr. Crowns determined that B.G. had been strangled by hand, Lopez's account of James's statement wrongly indicated that B.G. had been strangled by a belt. Further, unlike Lopez's account of James's statement, there is no objective indicia that B.G. had a purse on her when she was murdered. Finally, the State noted that "police developed an alibi witness for Najee James for the evening of the murder." At a subsequent hearing, the State disclosed that James's alibi witness was his mother.

¶ 17   Lopez gave an evidence deposition consistent with the allegations in defendant's motion. Lopez testified that on April 4, 2008, he attended a house party at 223rd Street and Torrence Avenue, which James also attended. Lopez "knew of" James for "[m]aybe a month" and they had "occasionally talked." At the party, James told Lopez and four or five other people that he had tried to take money from a young girl's purse, and when she resisted, he choked her with a belt and accidentally killed her. He and a friend then threw the girl's body into a creek.

¶ 18    Lopez testified that at the time of James's confession on April 4, he thought James was not being truthful because Lopez had previously heard James "talk about this stuff all the time" and liked to exaggerate to make himself "seem bigger." Lopez and James remained at the party overnight. The next day, April 5, 2008, James asked Lopez questions regarding how to cover up the murder. Lopez still did not take James seriously. However, on April 6, 2008, Lopez's family told him about B.G.'s murder and his father convinced him to report James's confession to the police that same day. Lopez did not remember talking to the police on any other date.

¶ 19    The trial court held a hearing on defendant's motion at which the parties reiterated their arguments for and against the admission of James's purported confession to Lopez. During the hearing, the trial court specifically asked defense counsel about the exact date that Lopez told the police of James's confession. Defense counsel responded, "I don't know exactly, but it was, I think, a few weeks after this all occurred." The State asserted that Lopez did not report James's statement to the police until May 25, 2008, nearly two months after B.G.'s murder. Defense counsel did not disagree with the State's assertion, nor was there any disagreement that James denied confessing and that James's mother was an alibi witness for him.

¶ 20    The trial court subsequently entered a written decision examining the four *Chambers* factors. As to the first factor, that the statement was made spontaneously to a close acquaintance shortly after the crime occurred, the court noted that James and Lopez were not "close acquaintances which would ensure a close trusting relationship." The court found it "[h]ard to believe that a person *** is going to confide the commission of a crime of murder to, at best, an acquaintance."

¶ 21    As to the second factor, whether the statement is corroborated by other evidence, the court found no such corroboration. The court noted that based on the representations at the hearing,

Lopez waited seven weeks, until May 25, 2008, before reporting James's statement to the police, during which time the news media had reported a general description of B.G.'s murder. Lopez's account of James's statement mirrored the news media accounts and offered no new information. Further, Lopez's account of James's statement failed to note pertinent information that had not been released to the media, such as that B.G. had been sexually assaulted and that when her body was found, she was naked from the waist down. The trial court found that "[s]omeone that had committed the murder would have known those particulars, and not generalities that were reported in the newspaper." Lopez's account of James's statement was also factually inaccurate with regard to B.G.'s cause of death, as Lopez recounted James's assertion that he had strangled B.G. with a belt, which was contrary to the medical examiner's finding that B.G. had been strangled by hand. The trial court concluded, "the corroboration required under *Chambers* is not met."

¶ 22    With respect to the third factor, whether the statement is self-incriminating and against the declarant's interest, the court found that there was not even sufficient indicia that a statement was ever made.

¶ 23    With respect to the fourth factor, whether there was adequate opportunity for cross-examination of the declarant, the court found that this element was not met because James denied making the statement.

¶ 24    The trial court concluded:

> "[A]lthough it is not necessary that all elements under *Chambers* must be met, and that these elements are not exclusive, the courts have set a standard under the totality of circumstances that the declaration must be made under circumstances that provide considerable assurances of reliability by 'objective indicia of trustworthiness.' Here, this

Court believes that the defense has not been able to meet that standard and therefore the motion to allow Third party Confession by Najee James to the Murder of [B.G.] is denied."

¶ 25 On direct appeal, defendant argued that the trial court erred in finding under the fourth *Chambers* factor that James's denial of making the statement precluded any effective cross-examination of him. *Id.* ¶ 53. We held:

"[E]ven if the trial court erred in finding Mr. James unavailable for cross-examination, we would not reverse the denial of defendant's motion. The *Chambers* factors are mere guidelines to admissibility, and the relevant question is whether the statement was made under circumstances providing considerable assurance of its reliability by objective indicia of trustworthiness. [Citation.] The trial court here carefully considered all the circumstances surrounding the making of the alleged statement, noting that: Mr. James and Mr. Lopez were mere acquaintances, making it unlikely Mr. James would confide to Mr. Lopez that he had committed murder; Mr. Lopez waited seven weeks before going to the police, and his recitation of Mr. James' statement mirrored media accounts of the murder, failed to include pertinent information not released to the media, and contradicted the medical examiner's findings; there was no corroboration of Mr. James' statement; and no objective indicia that the statement was ever made. Based on these findings, the trial court did not abuse its discretion in ruling that Mr. James' alleged statement to Mr. Lopez was not sufficiently reliable to merit admission under *Chambers*." *Id.* ¶ 54.

¶ 26 We affirmed defendant's convictions and sentence. *Id.* ¶ 96.

¶ 27 On September 29, 2016, defendant filed a *pro se* postconviction petition alleging that his counsel provided ineffective assistance during the hearing on his motion for admission of James's confession, by failing to refute the State's argument that Lopez waited seven weeks until May 25,

2008, after the news media reported the killing, to go to the police and tell them about the confession. The State argued at the hearing that the alleged confession merely mirrored news accounts of the murder published on April 8 and failed to contain details withheld from the press, such as that B.G. was found naked from the waist down and had been sexually assaulted. However, Lopez had testified in his deposition that he actually went to the police on April 6, 2008, which was two days *before* the first media report about the killing. Defendant argued in his postconviction petition that counsel's failure to inform the court about the actual date Lopez reported the confession to the police misled the court into thinking that he waited until after the news media reported a general description of B.G.'s murder. Defendant contended that his counsel's failure to correct the State's assertion that Lopez waited seven weeks to go to the police constituted ineffective assistance because the court considered the alleged seven-week delay in reporting as a factor showing that the alleged statement was unreliable under *Chambers*.

¶ 28    Postconviction counsel subsequently filed a supplemental petition realleging that trial counsel was ineffective for failing to inform the trial court of the correct date Lopez said that he reported James's confession to the police and further alleging that appellate counsel was ineffective on direct appeal for failing to argue trial counsel's ineffectiveness.

¶ 29    The cause proceeded to the second stage of postconviction proceedings, where the State filed a motion to dismiss. The court granted the dismissal motion and defendant filed this timely appeal. Defendant contends that we should reverse the second-stage dismissal of his initial and supplemental postconviction petitions because they make a substantial showing that his trial and appellate counsels rendered ineffective assistance.

¶ 30    The Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2024)) sets forth a three-stage process by which a criminal defendant may raise constitutional issues about his trial or

sentencing that could not have been raised on direct appeal. *People v. Morales*, 2019 IL App (1st) 160225, ¶ 17. At the first stage, the postconviction court evaluates the petition and determines whether it is frivolous or patently without merit. *Id.* If the court determines that the petition is not frivolous or patently without merit, it is docketed for second-stage proceedings, during which counsel can be retained or appointed, and defendant must show that his petition makes a substantial showing of a constitutional violation. *Id.* The State can participate for the first time at the second stage and either answer the petition or move to dismiss. *Id.* All well-pleaded facts that are not positively rebutted by the original trial record are taken as true and the court does not engage in fact-finding or credibility determinations nor resolve any evidentiary questions. *People v. Velasco*, 2018 IL App (1st) 161683, ¶ 90. Our review of a second-stage dismissal is *de novo*. *People v. Minniefield*, 2014 IL App (1st) 130535, ¶ 58. If the petition makes a substantial showing of a constitutional violation, it advances to the third-stage evidentiary hearing where the postconviction court receives evidence and determines whether defendant is entitled to relief. 725 ILCS 5/122-6 (West 2024).

¶ 31 Ineffective assistance of counsel claims are governed by the standard set forth in *Strickland v. Washington*, 466 U.S 668 (1984). Pursuant to that standard, in order to prevail on a claim of ineffective assistance of counsel, defendant must show "that counsel's performance was objectively unreasonable under prevailing professional norms" and that defendant was prejudiced thereby such that "there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different." *People v. Roland*, 2023 IL 128366, ¶ 26. On review, we may dispose of an ineffective assistance claim based on lack of prejudice without determining whether counsel's performance was deficient. *People v. Johnson*, 2021 IL 126291, ¶ 53.

¶ 32 The *Strickland* standard similarly applies to claims of ineffective assistance of appellate counsel. *People v. Johnson*, 205 Ill. 2d 381, 405 (2002). "A defendant who claims that appellate counsel was ineffective must show that the failure to raise an issue on appeal was objectively unreasonable and this decision prejudiced the defendant." *Id.* at 405-06. Appellate counsel is not required to raise nonmeritorious issues. *Id.* at 406.

¶ 33 Defendant's postconviction claims of ineffective assistance center on his trial counsel's failure to inform the trial court of the correct date on which Lopez went to the police and told them about James's confession and on appellate counsel's failure to raise the issue of trial counsel's ineffectiveness. Defendant argues that the trial court's decision to deny his motion for the admission of James's confession was largely premised on its erroneous finding that Lopez delayed going to the police until *after* the media had generally reported on B.G.'s murder. Defendant posits that if counsel had correctly informed the court that Lopez went to the police only one day after the confession and two days before any media reports on the murder, there is a reasonable probability that the court would have admitted James's confession and that the jury would have reached a different result at trial.

¶ 34 The State does not dispute that defendant has made a substantial showing that trial counsel's failure to inform the trial court of the correct date on which Lopez told the police of James's confession constituted deficient performance, or that appellate counsel's failure to raise the issue of trial counsel's ineffectiveness was similarly deficient. The State's argument is, first, that defendant forfeited the ineffective assistance of trial counsel claim by failing to raise it on direct appeal and, second, that defendant's postconviction claims of ineffective assistance of trial and appellate counsel fail because defendant has made no substantial showing that he was prejudiced by his counsels' conduct.

¶ 35 Defendant's claims are not forfeited because he alleged in his supplemental petition that his appellate counsel was ineffective on direct appeal for failing to raise his trial counsel's ineffectiveness. See *People v. Williams*, 2024 IL 127304, ¶ 20 ("When a postconviction petitioner asserts claims that could have been raised on direct appeal, he can avoid the procedural bar of forfeiture by casting his claims as ineffective assistance of appellate counsel for failing to raise the issues on direct appeal.") Forfeiture aside, for the reasons that follow, we find that defendant's postconviction claim of ineffective assistance of trial counsel fails for lack of prejudice because the trial court likely would have denied defendant's motion to admit James's confession even if counsel had made it aware of the correct date on which Lopez went to the police; further, the jury likely would have reached the same verdict even if the confession had been admitted. We further find, for the reasons that follow, that since defendant's underlying claim of ineffective assistance of trial counsel is without merit, defendant also fails to show how he was prejudiced by appellate counsel's failure to raise that issue on appeal.

¶ 36 We begin our analysis by noting that when denying defendant's motion to admit James's confession to Lopez, the trial court did not rely solely on the date when Lopez went to the police but instead carefully considered all the *Chambers* factors to determine the reliability of the statement. First, the court noted that James and Lopez were not close friends with a "trusting relationship" but were merely casual acquaintances and, as such, the court found it "hard to believe" that James would confide the commission of such a heinous crime to "at best, an acquaintance."

¶ 37 Second, the court considered whether James's confession was corroborated by other evidence. It was during the consideration of any such corroborative evidence that the court inaccurately noted that Lopez had waited about seven weeks, until May 25, 2008, before reporting

James's statement to the police, during which time the news media had reported a general description of B.G.'s murder. As discussed, Lopez testified that he reported James's statement to the police on April 6, 2008, *before* the news media accounts of the murder, but defense counsel failed to so inform the court. However, in finding a lack of corroboration, the court did not merely rely on its inaccurate finding that Lopez had delayed going to the police until May 25, 2008, but also relied on its correct observation that Lopez's account of James's statement was factually inaccurate with regard to B.G.'s cause of death. The court noted that Lopez recounted James's assertion that he strangled B.G. with a belt, which was contrary to the medical examiner's finding that B.G. actually had been strangled by hand. Further, Lopez's account of James's statement failed to note that B.G. had been sexually assaulted and that her body was naked from the waist down when it was dumped in the creek. Given these discrepancies between James's alleged statement and the actual facts surrounding B.G.'s sexual assault and murder, the court found a lack of corroboration.

¶ 38    Third, the court considered whether the statement was self-incriminating against the declarant's interest. The court found that "[i]n order for this requirement to be met, the Court would have to be satisfied that in fact a statement by a third party had been made." The court further found, based on the totality of the circumstances, "there is not sufficient indicia of reliability that a statement was ever made." In reaching this conclusion, the court noted James's denial that he made the statement, the lack of corroboration for this statement, plus the establishment of an alibi for James at the time the crime was committed. Accordingly, the court found "the third requirement was not met."

¶ 39    Fourth, the court found that James's denial of making the statement precluded any effective cross-examination of him and as such that the fourth *Chambers* factor was not met.

¶ 40    We are convinced from this review of the record that the trial court's denial of defendant's motion for the admission of James's confession was premised on its finding that defendant had failed to show that the statement was reliable and trustworthy under *any* of the *Chambers* factors. In denying the motion, the court made an inaccurate finding as to the date of Lopez's recounting of James's statement to the police which was not corrected by counsel, but the court otherwise accurately found that the *Chambers* factors were not met where Lopez and James were mere acquaintances, the statement contained factual inaccuracies with respect to B.G.'s cause of death which were not corroborated, and there was no objective indicia that the statement was ever made. On this record, defendant has failed to make a substantial showing that the court's decision was premised solely on its inaccurate finding as to the date of Lopez's recounting of James's statement to the police or that the court's decision would have changed had counsel informed it of the correct date on which Lopez went to the police. As such, defendant has failed to make a substantial showing he was prejudiced by his trial counsel's allegedly deficient conduct and therefore his postconviction claim of ineffective assistance of trial counsel fails. Defendant's claim of ineffective assistance of appellate counsel also fails because appellate counsel was not required to raise the nonmeritorious issue of trial counsel's alleged ineffectiveness. *Johnson*, 205 Il. 2d at 406.

¶ 41    We further note that defendant's postconviction claims of ineffective assistance fail because even if the trial court would have admitted James's statement, the result of the trial likely would not have changed. This was not a close case, as defendant was the last known person to be with B.G and the single-source human male DNA profile found in B.G.'s vaginal swab matched defendant's DNA profile at all 14 comparison locations. Dr. Turngren, the DNA expert, testified that based on known frequencies of those DNA types, the male DNA profile would be expected to

occur in 1 in 6 quintillion African-American, 1 in 63 quintillion Hispanic, or 1 in 91 quintillion white unrelated individuals.

¶ 42    In addition to the DNA evidence, defendant made contradictory statements to B.G.'s best friend about what had happened to her when she went missing. First defendant said he walked around Sauk Village with B.G. and returned her home. Later, he said that he took B.G. to Rickover and left her there.

¶ 43    Evidence was also admitted of defendant's history of reacting violently when his sexual advances were rebuked. On two occasions in February 2008, defendant made sexual overtures to a fellow student, Catherine Kulakowski. When Kulakowski refused him the first time, he bruised her arms; when she refused him the second time, he slammed his chair down and swiped all the books off the desk. Such evidence was admitted to show defendant's intent and lack of innocent frame of mind at the time of B.G.'s sexual assault.

¶ 44    Given all this evidence against defendant, he has failed to make a substantial showing of a reasonable probability that the jury would have acquitted him had James's statement been admitted. James's statement was not so probative as to change the jury's verdict where, as discussed, James denied making the statement and had an alibi witness, and where the statement was made to someone who was not a close acquaintance and it was factually inaccurate with respect to B.G.'s cause of death. Accordingly, defendant has not satisfied the prejudice component of the *Strickland* standard for ineffective assistance of counsel claims.

¶ 45    For all the foregoing reasons, we affirm the circuit court.

¶ 46    Affirmed.